# CIVIL COVER SHEET

JS 44 C AND   (Rev. 12/11)

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

JACQUELINE JEANNE BARTH

### DEFENDANTS

LINUS LIANG

**(b)** County of Residence of First Listed Plaintiff   New York
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Gerald E. Hawxhurst, jerry@cronehawxhurst.com
CRONE HAWXHURST LLP
10880 Wilshire Blvd., Ste 1150, Los Angeles, CA 90024 (310) 893-5150

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1  U.S. Government
        Plaintiff

☐ 3  Federal Question
        *(U.S. Government Not a Party)*

☐ 2  U.S. Government
        Defendant

☒ 4  Diversity
        *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff)*
*(For Diversity Cases Only)* and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

### CONTRACT
☐ 110 Insurance
☐ 120 Marine
☐ 130 Miller Act
☐ 140 Negotiable Instrument
☐ 150 Recovery of Overpayment & Enforcement of Judgment
☐ 151 Medicare Act
☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
☐ 153 Recovery of Overpayment of Veteran's Benefits
☒ 160 Stockholders' Suits
☒ 190 Other Contract
☐ 195 Contract Product Liability
☐ 196 Franchise

### REAL PROPERTY
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

### TORTS

**PERSONAL INJURY**
☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers' Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Personal Injury - Med. Malpractice

**PERSONAL INJURY**
☐ 365 Personal Injury - Product Liability
☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability
☐ 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

### CIVIL RIGHTS
☐ 440 Other Civil Rights
☐ 441 Voting
☐ 442 Employment
☐ 443 Housing/ Accommodations
☐ 445 Amer. w/Disabilities - Employment
☐ 446 Amer. w/Disabilities - Other
☐ 448 Education

### PRISONER PETITIONS
☐ 510 Motions to Vacate Sentence
**Habeas Corpus:**
☐ 530 General
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition
☐ 560 Civil Detainee - Conditions of Confinement

### FORFEITURE/PENALTY
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 690 Other

### LABOR
☐ 710 Fair Labor Standards Act
☐ 720 Labor/Mgmt. Relations
☐ 740 Railway Labor Act
☐ 751 Family and Medical Leave Act
☐ 790 Other Labor Litigation
☐ 791 Empl. Ret. Inc. Security Act

### IMMIGRATION
☐ 462 Naturalization Application
☐ 463 Habeas Corpus - Alien Detainee (Prisoner Petition)
☐ 465 Other Immigration Actions

### BANKRUPTCY
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

### PROPERTY RIGHTS
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

### SOCIAL SECURITY
☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g))
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))

### FEDERAL TAX SUITS
☐ 870 Taxes (U.S. Plaintiff or Defendant)
☐ 871 IRS—Third Party 26 USC 7609

### OTHER STATUTES
☐ 375 False Claims Act
☐ 400 State Reapportionment
☐ 410 Antitrust
☐ 430 Banks and Banking
☐ 450 Commerce
☐ 460 Deportation
☐ 470 Racketeer Influenced and Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Sat TV
☐ 850 Securities/Commodities/ Exchange
☐ 890 Other Statutory Actions
☐ 891 Agricultural Acts
☐ 893 Environmental Matters
☐ 895 Freedom of Information Act
☐ 896 Arbitration
☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
☐ 950 Constitutionality of State Statutes

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district *(specify)*
☐ 6 Multidistrict Litigation

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. § 1332(a)
Brief description of cause:
Declaratory Judgment; Breach of Contract, Breach of the Covenant of Good Faith and Fair Dealing

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

**DEMAND $**
412,000.00

CHECK YES only if demanded in complaint:
**JURY DEMAND:**   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*   JUDGE _____   DOCKET NUMBER _____

## IX. DIVISIONAL ASSIGNMENT (Civil L.R. 3-2)
*(Place an "X" in One Box Only)*

☒ SAN FRANCISCO/OAKLAND   ☐ SAN JOSE   ☐ EUREKA

DATE  06/21/2012

SIGNATURE OF ATTORNEY OF RECORD
Gerald Hawxhurst / KRB

FAXED

FILED

2012 JUN 21 P 3: 41

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

1 Gerald E. Hawxhurst (Bar No. 220327)
  jerry@cronehawxhurst.com
2 Joshua P. Gelbart (Bar No. 274021)
  jgelbart@cronehawxhurst.com
3 CRONE HAWXHURST LLP
  10880 Wilshire Blvd., Suite 1150
4 Los Angeles, California 90024
  Telephone:  (310) 893-5150
5 Facsimile:  (310) 893-5195

6 Attorneys for Plaintiff
  Jacqueline Jeanne Barth

**E-filing**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANSISCO DIVISION

**MEJ**

**CV 12 3233**

JACQUELINE JEANNE BARTH,

    Plaintiff,

    v.

LINUS LIANG,

    Defendant.

CASE NO.

**COMPLAINT FOR:**

(1) **DECLARATORY JUDGMENT;**
(2) **BREACH OF WRITTEN CONTRACT;**
(3) **BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING**

**JURY TRIAL DEMANDED**

ORIGINAL

FAXED

CRONE HAWXHURST LLP
10880 WILSHIRE BOULEVARD, SUITE 1150
LOS ANGELES, CALIFORNIA 90024
Tel: (310) 893-5150 • Fax: (310) 893-5195

COMPLAINT

1    Plaintiff Jacqueline Jeanne Barth ("Ms. Barth"), by and through her
2  attorneys, for her complaint against defendant Linus Liang ("Liang"), alleges the
3  following upon knowledge as to her own actions and upon information and belief
4  for the remainder of the complaint:

5                              **NATURE OF THE ACTION**

6    1.    On or about September 2011, Ms. Barth sought to acquire twenty
7  thousand (20,000) shares of Class A Common stock of Zynga (the "Shares") from
8  Liang. She did this by electronically signing a SharesPost Stock Purchase
9  Agreement ("SharesPost SPA") and related documents via SharesPost, an online
10  marketplace providing, *inter alia*, an environment for early investors and employee
11  shareholders to sell stock in a variety of high growth private companies.

12    2.    This action arises from Liang's deliberate and wrongful efforts to
13  slow-play the transfer of Shares and misuse the SharesPost SPA and delay in
14  providing other necessary information to essentially give himself a "put" of the
15  Shares to Ms. Barth, depending on the ultimate pricing of Zynga's initial public
16  offering ("IPO").

17    3.    Liang was repeatedly unresponsive to communications from
18  SharesPost aimed at expediting the conclusion of an agreement and satisfaction of
19  preconditions for the sale and transfer of the Shares, only seeking to conclude an
20  agreement once the IPO price of Zynga had been set, and then expecting Ms. Barth
21  to sign a Stock Purchase Agreement from Zynga (the "Zynga SPA"). Not only was
22  the provision of the Zynga SPA delayed and in violation of the SharesPost SPA's
23  condition not to further restrict an agreement for the sale and transfer of Shares, it
24  required Ms. Barth to make representations and warranties that were not accurate.

25    4.    Since the signing of the SharesPost SPA and the related Escrow
26  Agreement in October 2010, $413,500 of Ms. Barth's capital has been held in an
27  escrow account. The escrow agent, U.S. Bank, N.A., will not return Ms. Barth's
28  money unless Liang authorizes it to do so or it is ordered to do so by court order.

CRONE HAWXHURST LLP
10880 WILSHIRE BOULEVARD, SUITE 1150
LOS ANGELES, CALIFORNIA 90024
Tel: (310) 893-5150 • Fax: (310) 893-5195

- 1 -

1    5.    Because Liang refuses to instruct the escrow agent to return Ms.
2  Barth's money to her, Ms. Barth seeks a declaratory judgment from the Court that
3  the SharesPost SPA and the Zynga SPA are unenforceable.  In the alternative, Ms.
4  Barth seeks an order from the Court declaring that Liang breached the SharesPost
5  SPA and/or the Zynga SPA and that Liang breached the covenant of good faith and
6  fair dealing.  Ms. Barth seeks a judicial declaration that $412,000 of the amount
7  Ms. Barth placed into the escrow account should be returned to her.

8                          **PARTIES**

9    6.    Jacqueline Jeanne Barth is a resident and citizen of New York.

10    7.    Defendant Linus Liang is a citizen of California or place other than
11  New York State.

12  **JURISDICTION, INTRADISTRICT ASSIGNMENT, VENUE AND**
13                    **APPLICABLE LAW**

14    8.    The Court has subject matter jurisdiction over this action pursuant to,
15  *inter alia*, 28 U.S.C. § 1332(a) because the parties are completely diverse and the
16  amount in controversy exceeds $75,000, exclusive of interest and costs of suit.

17    9.    The Court has personal jurisdiction over Liang because he has
18  consented in writing to personal jurisdiction here.  In addition, Liang has minimum
19  contacts with the forum sufficient to subject him to specific and general personal
20  jurisdiction in this forum.

21    10.    Venue lies in this district pursuant to 28 U.S.C. §§ 1391(a) and (c)
22  because: (i) a substantial part of the events or omissions giving rise to this action
23  occurred within this district; specifically, SharesPost and its employees, the
24  company through which the agreement for the purchase and transfer of Shares was
25  to be coordinated, are located within this district; (ii) Liang has consented to venue
26  in this district; and (iii) Liang has sufficient contacts within this district to be
27  subject to personal jurisdiction in this district if this district were a separate state.

28    11.    Pursuant to Local Rule 3-2, subsections (c) and (d), intradistrict

CRONE HAWXHURST LLP
10880 WILSHIRE BOULEVARD, SUITE 1150
LOS ANGELES, CALIFORNIA 90024
Tel: (310) 893-5150 • Fax: (310) 893-5195

- 2 -

1  assignment is proper in the San Francisco Division of this Court because a
2  substantial part of the events or omissions which give rise to the claim occurred in
3  San Mateo County. Additionally, on information and belief, witnesses to the
4  events or omissions giving rise to this action are located in San Mateo County.

5      12.   The SharesPost SPA and the Zynga SPA, both signed by Liang,
6  provide that the parties' dispute is governed by and shall be determined in
7  accordance with California law, without giving effect to that body of laws
8  pertaining to conflict of laws.

9                          **FACTUAL ALLEGATIONS**

10     13.   On information and belief, Liang owns or did own shares of Class A
11 Common Stock in Zynga.

12     14.   According to its marketing material, nonparty SharesPost, Inc.
13 ("SharesPost") provides a private environment for early investors and employee
14 shareholders to sell their shares prior to a company's initial public offering or other
15 liquidity event. SharesPost claims to have facilitated transactions in private
16 company stock of companies including Zynga, Facebook and Twitter, among
17 others.

18 **A.   The SharesPost Stock Purchase Agreement and Liang's Delay**

19     15.   On or about September 13, 2011, Ms. Barth indicated via SharesPost
20 that she wanted to contract for the purchase of 20,000 Zynga shares. She
21 electronically signed the SharesPost SPA and related documents, whereby Ms.
22 Barth indicated her intent to purchase from Liang 20,000 shares of Zynga Class A
23 Common Stock (as defined above, the "Shares") for $20 per share and an aggregate
24 price of $400,000, provided certain preconditions had been satisfied by Liang.

25     16.   Even though SharesPost generally requires the seller to countersign
26 the SharesPost SPA within 48 hours of the buyer's execution, Liang delayed
27 signing the SharesPost SPA for more than *five weeks*, on or about October 20,
28 2011.

CRONE HAWXHURST LLP
10880 WILSHIRE BOULEVARD, SUITE 1150
LOS ANGELES, CALIFORNIA 90024
Tel: (310) 893-5150 • Fax: (310) 893-5195

- 3 -

17.     In the SharesPost SPA, Liang represented and warranted that he was the Shares were free of any restrictions except for applicable securities laws, lock-up provisions, and any operable stockholders' agreement that was supposed to be attached as exhibit D to the SharesPost SPA. No Stockholder's Agreement, however, was attached to the SharesPost SPA or otherwise at any time provided to Ms. Barth.

18.     Pursuant to the Escrow Agreement, an escrow account to facilitate the contemplated transfer of the Shares was opened with U.S. Bank N.A. on or about October 26, 2011, and funded shortly thereafter.

19.     The funds deposited into the escrow account consisted of the contemplated purchase price for the Shares ($400,000), a SharesPost finder's fee ($12,000), and Ms. Barth's share of the escrow fee ($1,500), for a total of $413,500.00.

**B.     Notice is Provided to Zynga and Zynga Approved the Transfer**

20.     On or about November 2, 2011, Zynga was purportedly provided with notice of the proposed transfer and of its right to exercise its Right of First Refusal to purchase the Shares from Liang.

21.     On or about December 1, 2011, Jaclyn Strife ("Strife"), an employee of SharesPost, came to know that Zynga waived its Right of First Refusal, and Strife communicated Zynga's waiver of its Right of First Refusal to Ms. Barth on or about December 2, 2011.

**C.     Liang Again Delays Transfer of the Shares**

22.     Following Zynga's waiver of its Right of First Refusal, Liang *again delayed* the conclusion of an agreement. On or about December 9, 2011, Strife emailed Ms. Barth to say that she "finally heard back from the Zynga seller and he has asked us to proceed with the transaction."

23.     At this point, the target stock price for Zynga's IPO had already been set and disseminated by way of Zynga's IPO "roadshow." The IPO price estimates

CRONE HAWXHURST LLP
10880 WILSHIRE BOULEVARD, SUITE 1150
LOS ANGELES, CALIFORNIA 90024
Tel: (310) 893-5150 • Fax: (310) 893-5195

- 4 -

1  were between $8.50 and $10 per share, far less than the $20 per share Ms. Barth
2  had offered in September, at a time when the IPO pricing was uncertain.

3  **D.**  **Liang Asks Ms. Barth to Make Inaccurate Representations and**
4  **Warranties; Liang Fails to Comply with the Seller's Requirements**

5  24.  Although Liang represented and warranted in the SharesPost SPA that
6  the Shares were being offered free from restrictions not identified in the SharesPost
7  SPA, on or about December 12, 2011, SharesPost sent Ms. Barth the Zynga Stock
8  Purchase Agreement (the "Zynga SPA"), executed by Liang that did contain
9  restrictions.

10  25.  In addition, section 3.7 of the Zynga SPA required Ms. Barth to make
11  an untrue representation. Namely, it required Ms. Barth to represent that she "has
12  not relied on Seller, the Company [Zynga] or any representative of the Company
13  for any information regarding the Company or the value of the Shares."

14  26.  Ms. Barth could not make those representations and warranties,
15  because by then she had received and relied on such information about the
16  Company and the value of its Shares.

17  27.  Ms. Barth did not sign or otherwise agree to the Zynga SPA.

18  28.  On information and belief, Liang did not comply with the Zynga SPA.
19  Section 2.2 of the Zynga SPA, which required Liang to provide Zynga with a legal
20  opinion letter from counsel stating that an offer and sale of the Shares was being
21  made pursuant to Rule 144 of the Securities Act of 1933, and was in compliance
22  with all applicable federal and state securities law. No such opinion was ever
23  transmitted or disclosed to Ms. Barth. Upon information and belief, Liang failed to
24  provide such an opinion to Zynga.

25  **E.**  **Ms. Barth Sought to Terminate the Escrow Agreement**

26  29.  On or about December 19, 2011, Ms. Barth requested the return of her
27  funds from escrow. Liang objected to her request.

28  30.  Pursuant to the Escrow Agreement, the escrow agent will hold all

CRONE HAWXHURST LLP
10880 WILSHIRE BOULEVARD, SUITE 1150
LOS ANGELES, CALIFORNIA 90024
Tel: (310) 893-5150 • Fax: (310) 893-5195

- 5 -

1 funds and all documents pertaining to the escrow account until the escrow agent
2 receives either: (i) termination instructions jointly executed by Barth and Liang; or
3 (ii) a court order requiring it to do so. Liang refused to instruct the escrow agent to
4 terminate the escrow and return Ms. Barth's money to her.

### FIRST CLAIM FOR RELIEF

### (Declaratory Judgment Against Liang)

7     31.   Ms. Barth incorporates the allegations in paragraphs 1 through 30 as if
8 fully set forth herein.

9     32.   Since the signing of the SharesPost SPA and the related Escrow
10 Agreement between Ms. Barth and Liang in October 2010, $412,000 of Ms.
11 Barth's capital has been held in an escrow account.

12     33.   A declaratory judgment is necessary because the escrow agent will not
13 release the $412,000 belonging to Ms. Barth ($1,500 is part of the escrow fee) until
14 it receives an order by the Court, as Liang will not provide joint instructions to the
15 escrow agent.

16     34.   Ms. Barth and Liang have an actual controversy concerning whether
17 the SharesPost SPA and/or the Zynga SPA are enforceable, including whether Ms.
18 Barth is contractually bound to purchase the Shares from Liang.

19     35.   The parties have a real and adverse interest in the controversy, and it
20 is ripe for judicial determination.

21     36.   By reason of the foregoing and pursuant to 28 U.S.C. §§ 2201 and
22 2202, Ms. Barth is entitled to a declaration that (i) the SharesPost SPA and/or the
23 Zynga SPAs are unenforceable as against her; and (ii) the funds held in escrow
24 (minus Ms. Barth's portion of the escrow fee ($1,500)) should be returned to Ms.
25 Barth.

26 ///

27 ///

28 ///

CRONE HAWXHURST LLP
10880 WILSHIRE BOULEVARD, SUITE 1150
LOS ANGELES, CALIFORNIA 90024
Tel: (310) 893-5150 • Fax: (310) 893-5195

COMPLAINT

## SECOND CLAIM FOR RELIEF

### (Breach of Written Contract)

37.    Ms. Barth incorporates the allegations in paragraphs 1 through 30 as if fully set forth herein, and in the alternative alleges the following.

38.    The SharesPost SPA is a valid and enforceable written contract.

39.    Ms. Barth has performed her obligations and complied with all conditions and requirements of the SharesPost SPA.  To the extent that Ms. Barth has not performed all of her obligations and complied with all of the conditions under the SharesPost SPA, her performance of such has been excused, waived, prevented or made impossible or impracticable by Liang.

40.    Liang materially breached the SharesPost SPA by, among other things: (1) unreasonably delaying performance in such a way that, in light of the circumstances, the original purpose of the contract no longer existed; (2) further restricting the sale and transfer of the Shares by requiring Ms. Barth to sign the Zynga SPA; and (3) preventing and making impossible the transfer of the shares by requiring Ms. Barth to make inaccurate representations and warranties in connection with the transfer.

41.    As a direct and proximate cause of Liang's wrongful conduct in breach of the SharesPost SPA, Ms. Barth has suffered damages that exceed the minimum jurisdictional amount of the Court.

## THIRD CLAIM FOR RELIEF

### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

42.    Ms. Barth incorporates the allegations in paragraphs 1 through 30, and 37 through 41 as if fully set forth herein, and in the alternative alleges the following.

43.    The SharesPost SPA is a valid and enforceable written contract.

- 7 -

CRONE HAWXHURST LLP
10880 WILSHIRE BOULEVARD, SUITE 1150
LOS ANGELES, CALIFORNIA 90024
Tel: (310) 893-5150 • Fax: (310) 893-5195

1    44.   Ms. Barth has performed her obligations and complied with all
2  conditions and requirements of the SharesPost SPA.  To the extent that Ms. Barth
3  has not performed all of her obligations and complied with all of the conditions
4  under the SharesPost SPA, her performance of such has been excused, waived,
5  prevented or made impossible or impracticable by Liang.

6    45.   Through Liang's multiple delays in meeting his obligations under the
7  SharesPost SPA, and because: (1) Liang waited to pursue the transaction until an
8  IPO price had been set (or at least the range had been set); (2) further restricted the
9  sale and transfer of the Shares by requiring Ms. Barth to sign the Zynga SPA; and
10  (3) sought to force Ms. Barth to make inaccurate representations and warranties in
11  connection with the transfer of Shares, Liang breached the covenant of good faith
12  and fair dealing that California law applies to all agreements.

13    46.   As a direct and proximate cause of Liang's wrongful conduct in
14  breaching the implied covenant of good faith and fair dealing, Ms. Barth has
15  suffered damages that exceed the minimum jurisdictional amount of the Court's
16  jurisdiction.

17  ///
18  ///
19  ///
20
21
22
23
24
25
26
27
28

- 8 -

COMPLAINT

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Ms. Barth respectfully requests that the Court enter judgment in her favor and against defendant Liang as follows:

    a.   Granting Ms. Barth the judicial declaration of rights requested herein;

    b.   Awarding Ms. Barth monetary damages against Liang in an amount according to proof;

    c.   Awarding Ms. Barth her costs, expenses, disbursements, and attorney's fees in respect hereto; and

    d.   Granting Ms. Barth such other relief as the Court deems just and proper.

DATED: June 21, 2012          CRONE HAWXHURST LLP

By: Gerald Hawxhurst / KG
    Gerald E. Hawxhurst
    Attorneys for Plaintiff
    Jacqueline Jeanne Barth

CRONE HAWXHURST LLP
10880 WILSHIRE BOULEVARD, SUITE 1150
LOS ANGELES, CALIFORNIA 90024
Tel: (310) 893-5150 • Fax: (310) 893-5195

- 9 -

COMPLAINT

## DEMAND FOR JURY TRIAL

Plaintiff Jacqueline Jeanne Barth respectfully demands trial by jury pursuant to Fed. R. Civ. Proc. § 38(b).

DATED: June 21. 2012                    CRONE HAWXHURST LLP

By _Gerald Hawxhurst /KG_
   Gerald E. Hawxhurst
   Attorneys for Plaintiff
   Jacqueline Jeanne Barth

CRONE HAWXHURST LLP
10880 WILSHIRE BOULEVARD, SUITE 1150
LOS ANGELES, CALIFORNIA 90024
Tel: (310) 893-5150 • Fax: (310) 893-5195

- 10 -

COMPLAINT

# Exhibit A


sharespost

## STOCK PURCHASE AGREEMENT

THIS STOCK PURCHASE AGREEMENT (this "Agreement") is made between the Buyer (as defined below) and the Seller (as defined below). This Agreement is made as of the later date upon which either Buyer or Seller executes this Agreement.

### *RECITALS:*

A.    For purposes of this Agreement, the following defined terms shall have the meanings ascribed to them below.

| | |
|---|---|
| Company: | Zynga Game Network Inc. |
| Share Type: | Common |
| Number of Shares: | 20,000 |
| Price per Share: | $20.00 |
| Purchase Price: | $400,000.00 |

B.    The Seller owns the Number of Shares of the Share Type of the Company (the "Shares"). The Buyer desires to purchase the Shares from the Seller, and the Seller desires to sell and transfer the Shares to the Buyer. The consideration for the Shares to be purchased, sold and transferred hereunder shall be the Purchase Price.

C.    Buyer and Seller intend to enter into that certain Escrow Services Agreement, the Form of which is attached hereto as Exhibit A; it provides the terms under which Escrow Company (as defined therein) will facilitate the closing of the purchase and sale of the Shares as contemplated in this Agreement (the "Transaction").

D.    Buyer and Seller are simultaneously entering into that certain Indemnification Agreement with SharesPost, Inc. ("SharesPost"), attached hereto as Exhibit B, which, among other things, provides that Buyer and Seller indemnify SharesPost and its affiliates against any liability arising from the Transaction and acknowledge that SharesPost has made no representations or warranties and has given no advice of any kind concerning the Company, the Shares or the Transaction and has done nothing to process the Transaction.

E.    Buyer and Seller have obtained the form of this Agreement from SharesPost but acknowledge that they have each had the opportunity to review this form prior to signing it and they were and are free to contact each other to arrange for the use of an alternative form. Buyer and Seller acknowledge that *SharesPost has provided them with no legal advice* and does not represent either party and shall have no liability with respect to their use of this form.

Document Integrity Verified    EchoSign Transaction Number: JYIF5S669XL5JK

sharespost

## *A G R E E M E N T*

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth, the parties hereto agree as follows:

1.     Transfer of Shares., On the Transfer Date (as defined in Section 4), the Seller shall sell and transfer to the Buyer, and the Buyer shall purchase from the Seller, all beneficial and record ownership of the Shares in accordance with the terms of this Agreement. Such sale and transfer shall be free and clear of any liens, encumbrances, claims, security interests, options, charges or other restrictions, other than those described herein.

2.     Purchase Price. The consideration for the sale and transfer of the Shares by the Seller to the Buyer shall be the Price Per Share, for an aggregate amount equal to the Purchase Price, the receipt and sufficiency of which the Seller hereby acknowledges.

3.     Agreements Pertinent to the Shares. In the event that Seller is subject to a stockholders' agreement or similar agreement and such agreement requires that any transferee of the Shares agrees to be bound by and/or execute such agreement, Seller has attached true and complete copies of such agreement hereto as Exhibit D (the "Stockholders' Agreement"). Upon the Transfer Date, Buyer agrees to be bound by the terms of, and to execute, the Stockholders' Agreement if that is required by its terms to properly effect the Transaction. Buyer represents that he has reviewed and accepts any restrictions contained in the Stockholders' Agreement upon taking ownership of the Shares and/or any other obligations set forth therein.

4.     Deliveries and Closing. Upon the execution and delivery of this Agreement by both Buyer and Seller, Seller shall deliver to Escrow Company copies of the purchase, option or other agreement or document which gave rise to Seller's ownership of the Shares or a stock certificate representing the Shares in Seller's name. Escrow Company will then email Buyer copies of the same together with wire transfer instructions for this escrow's trust account. Buyer will then deliver to Escrow Company the Purchase Price in immediately available funds. Escrow Company will email notice to Seller of receipt of the Purchase Price and Seller will then deliver to Escrow Company a: (a) valid stock certificate(s) representing the Shares duly executed in blank; and (b) stock power(s) executed by Seller and directing the Company to transfer the Shares into the name of Buyer on the books and records of the Company (such stock power to be in the form specified by the Escrow Company); and (c) whatever other documentation the Company reasonably requires to process the transfer of the Shares to Buyer, including without limitation a legal opinion to the effect that the Transaction is in compliance with applicable securities laws. Escrow Company will then facilitate the transfer of the Shares to Buyer on the books and records of the Company. The "Transfer Date" will be deemed to have occurred on the date upon which the Company transfers beneficial ownership of the Shares to Buyer on the books and records of the Company. Promptly upon Escrow Company receiving the new certificate evidencing the Shares in the Buyer's name from the Company, Escrow Company will deliver the Purchase Price to Seller and the new share certificate to Buyer (the "Closing").. Both Buyer and Seller agree to take whatever other action may be reasonably required to effect the Transaction including without limitation the execution of customary documents requested by the Company. Buyer and Seller agree to be bound by, and make all deliveries according to, the terms of the Escrow Agreement.

Document Integrity Verified                                        EchoSign Transaction Number: JYIF5S669XL6JK

sharespost

    5.   Representations and Warranties. The following representations and warranties shall survive the Closing:

    (a)   Seller hereby represents and warrants to the Buyer that on the date hereof and at the Closing: (i) Seller holds valid and marketable title to the Shares which are fully paid and non-assessable and owns the Shares free and clear of all liens, claims, encumbrances, security interests, restrictions on transfer or other defects in title of any kind, and is offering, selling and transferring the Shares to the Buyer free and clear of all liens, claims, encumbrances, security interests, restrictions on transfer or other defects in title of any kind or description, except for: (1) applicable securities laws; and ((2) any Stockholders' Agreement attached as Exhibit D; and (3) any restriction on the transfer of the shares in connection with an initial public offering legended on the Shares (a "Lock-Up"); (ii) assuming compliance with the Stockholders' Agreement (if any), Seller has the right, power and authority to enter into and carry out the terms of this Agreement, including without limitation, the offer, sale and transfer of the Shares to the Buyer, and has taken all action necessary to validly do so; (iii) this Agreement is a legal, valid and binding agreement of Seller enforceable in accordance with its terms; (iv) assuming compliance with the Stockholders' Agreement (if any), neither the execution or performance of this Agreement or the Transaction will conflict with or result in a breach or termination of any agreement or evidence of indebtedness; (v) Seller is not a party to any contract that remains in effect with respect to the Shares other than those included in Exhibit D, and there are no restrictions on the offer, sale or transfer of the Shares other than the Lock-Up, the Stockholders' Agreement (if any) and under applicable securities laws; (vi) Seller has held the Shares and/or the options by which Seller acquired the Shares for a period of at least one year; (vii) Seller is not an "affiliate" of the Company as defined for purposes of SEC Rule 144; and (viii) Seller is not a broker or dealer ("broker-dealer") as defined for purposes of the Securities Exchange Act of 1934, associated with a broker-dealer, and/or in possession of a state securities license.

    (b)   Buyer hereby represents and warrants to Seller that on the date hereof and at the Closing: (i) Buyer has the right, power and authority to enter into and carry out the terms of this Agreement; (ii) this Agreement is a legal, valid and binding agreement of Buyer enforceable in accordance with its terms; (iii) Buyer has reviewed and executed the Buyer's Investment Representation Statement attached hereto as Exhibit C, affirms its accuracy and acknowledges that Seller, Escrow Company and SharesPost are relying on such statement in their actions pertaining to the Transaction; (iv) Buyer is not an "affiliate" of the Company as defined for purposes of SEC Rule 144; and (v) Buyer is not a broker or dealer ("broker-dealer") as defined for purposes of the Securities Exchange Act of 1934, associated with a broker-dealer, and/or in possession of a state securities license.

    (c)   Buyer and Seller represent to each other that on the date hereof and at the Closing: (i) they are entering into this Agreement voluntarily and they are not under any form of duress; (ii) they have such knowledge and experience in financial and business matters that they are capable of evaluating the merits and risks of the Transaction; (iii) they have had the opportunity to review the form of this Agreement with their legal and tax counsel and other advisors prior to executing it and are fully satisfied that its terms are fair and that it effects a fair exchange of value; (iv) they and/or their legal counsel are familiar with applicable securities laws regarding the Transaction, and are responsible for ensuring that their entry into the Transaction is in compliance with such laws; (v) they are not relying on any express or implied legal or investment advice or information from the other, Escrow Company or SharesPost with respect to the prospects or value of the Company or the Shares or any aspect of the Transaction; (vi) they acknowledge and accept that

Document Integrity Verified    EchoSign Transaction Number: JYIF5S669XL5JK

sharespost

the other party to the Transaction may have material, non-public information about the Company that they do not have and which has not been disclosed; (vii) they hereby irrevocably waive any right to, and agree to refrain from pursuing against the other party to the Transaction, against SharesPost, or against any other party, any and all actions, suits, litigations, arbitrations, proceedings, investigations, claims or liabilities of whatever nature (including but not limited to under SEC Rule 10b-5 or similar laws) that relate to the other party to the Transaction's potential possession of material, non-public information about the Company and (viii) other than as explicitly stated herein, they have not relied upon any other representation or warranty of the other, or any third party including, without limitation, SharesPost. SharesPost and the Company are hereby made express third party beneficiaries of the entirety of this Section 5, of Section 3, and of Recitals D and E.

(d)     If either Buyer or Seller becomes aware that any of the representations or warranties made hereunder is or becomes untrue at any time prior to the Closing, then they shall immediately deliver written notice of this to Escrow Company. Such notice shall identify the relevant representation or warranty and include a brief description of the pertinent facts and circumstances.

6.     Indemnification. Buyer and Seller each hereby agree to defend, indemnify and hold harmless the other and their partners, members, officers, directors, employees, agents, successors and assigns from and against any claim, damage, liability, loss, cost or expense (including reasonable attorneys fees) arising directly or indirectly out of: (i) any material failure of theirs to perform their obligations as set forth in this Agreement or the Escrow Agreement; (ii) any material inaccuracy or breach of any of their representations or warranties made in this Agreement, and (iii) any and all actions, suits, litigations, arbitrations, proceedings, investigations, claims or liabilities of whatever nature arising out of any of the foregoing. The remedies provided in this Section 6 shall be cumulative and shall not preclude the assertion by any party of any other rights or the seeking of any other remedies against any party.

7.     Termination.

(a)     Failure to Close. Either Buyer or Seller may in their sole discretion terminate this Agreement upon written notice to Escrow Company if: (i) the Transfer Date has not occurred on or before the date that is one hundred and twenty (120) days from the date hereof, *and* (ii) such party is not, and has not been, in material breach of any of its representations, warranties or obligations set forth in this Agreement.

(b)     Untrue Representation or Warranty. Either Buyer or Seller may in their sole discretion terminate this Agreement upon written notice to Escrow Company if: (i) any of the other party's representations or warranties are untrue in any material respect at any time prior to the Transfer Date, *and* (ii) such party is not, and has not been, in material breach of any of its representations, warranties or obligations set forth in this Agreement.

(c)     Failure to Perform. Either Buyer or Seller may in their sole discretion terminate this Agreement upon written notice to Escrow Company if: (i) the other party has failed to perform any of its obligations hereunder or under the Escrow Agreement and has not cured such failure within ten (10) days of written notice specifying the failure, *and* (ii) such party is not then in material breach of any of its representations, warranties or obligations set forth in this Agreement.

Document Integrity Verified ═══════════════════════════════════════════════ EchoSign Transaction Number: JYIF5S669XL5JK

sharespost

8.    Miscellaneous.

(a)    Notices and Demands.   All notices and demands required to be given hereunder shall be deemed to be duly given at the time of delivery if personally delivered, or forty-eight (48) hours after mailing if deposited with the U.S. Postal Service, postage prepaid, for mailing via certified mail, return receipt requested.

(b)    Confidentiality.   Buyer and Seller agree to hold the identity of the parties to this Agreement in confidence and not to disclose the same, except with respect to disclosures reasonably required to complete the Transaction or in connection with any required financial reports to investors or tax reporting.   Except for transaction data published via SharesPost, no public announcement or other statement to the public pertaining to the Transaction shall be made unless mutually agreed in writing by both Buyer and Seller.

(c)    Entire Agreement; Successors and Assigns.   This Agreement contains the entire understanding among the parties hereto and supersedes any prior written or oral agreement among the parties concerning the subject matter contained herein.   This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

(d)    Waiver.   No waiver of any breach or default of this Agreement by any party hereto shall be considered to be a waiver of any other breach or default of this Agreement.

(e)    Electronic Signature; Party's Identity. This Agreement may be executed by electronic signature and/or counterparts and when so executed by both Buyer and Seller shall be a valid and binding agreement upon both parties. Buyer and Seller acknowledge and accept that one or both of them may not have known the identity of the other at the time they executed this Agreement and agree that this fact in no way effects the validity or enforceability of this Agreement, and further agree and covenant not to challenge its validity or enforceability on any such grounds.

(f)    Amendment.   This Agreement may be amended or modified only by a written agreement duly executed by the parties to this Agreement.

(g)    Choice of Law.   This Agreement shall be interpreted in accordance with, and governed by, the laws of the State of California without reference to the choice of law rules in effect at any time in the State of California.

(h)    Headings.   The headings contained in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.

(i)    Severability.   If any provision of this Agreement is held by a court of competent jurisdiction to be contrary to law, the provision shall be modified by the court and interpreted so as best to accomplish the objectives of the original provision to the fullest extent permitted by law, and the remaining provisions of this Agreement shall remain in effect.

The parties hereto have caused this Stock Purchase Agreement to be electronically executed on the following signature page, as of the later date written next to Buyer's or Seller's name below.

\*\*\*\*

Document Integrity Verified                                                          EchoSign Transaction Number: JYIF5S669XL5JK

IN WITNESS WHEREOF, the authorized representatives of Buyer and Seller, intending to create a legally binding agreement, have each electronically executed this STOCK PURCHASE AGREEMENT below:

BUYER

*Jackie Barsh*
Jackie Barsh (Sep 13, 2011)

SELLER

sharespost

## Exhibit A

### ESCROW SERVICES AGREEMENT

Document Integrity Verified    EchoSign Transaction Number: JYIF5S669XL5JK

## ESCROW SERVICES AGREEMENT

THIS ESCROW SERVICES AGREEMENT (this "Agreement") is made by and among [Buyer name and identification as an individual or a [state] [corporation/business entity type] (the "BUYER"), [Seller name and identification as an individual or a [state] [corporation/business entity type](the " SELLER ") and U.S. Bank National Association, a national banking association ("Escrow Company"). This Agreement is made as of the latest date set forth next to Buyer's, Seller's or Escrow Company's name below.

### *RECITALS:*

A.     The Seller owns [# of shares] shares (the "Shares") of the Common Stock of [company legal name], a [state of incorporation] corporation (the "Company"). The Buyer desires to purchase the Shares from the Seller, and the Seller desires to sell and transfer the Shares to the Buyer (the "Transaction"). The consideration for the Shares to be purchased, sold and transferred hereunder shall be equal to [price per share] per Share or a total of [total purchase price] .

B.     To effect the Transaction, Buyer and Seller are simultaneously entering into that certain Stock Purchase Agreement (the "Purchase Agreement"). All terms used herein that are not otherwise defined shall have the meaning ascribed to them in the Purchase Agreement, including without limitation all references to exhibits or attachments to the Purchase Agreement.

C.     Buyer and Seller are simultaneously entering into that certain Indemnification Agreement with SharesPost, Inc. ("SharesPost"), attached to the Purchase Agreement as Exhibit B, which, among other things, provides that Buyer and Seller indemnify SharesPost and its affiliates against any liability arising from the Transaction.

### *AGREEMENT*

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth, the parties hereto hereby agree as follows:

1.     Purchase and Sale. This escrow is established by and between Seller and Buyer to facilitate Buyer's purchase of [# of shares] shares of the common stock of Company, from Seller and the transfer of the same from Seller to Buyer on the books and records of the Company.

2.     Deliveries. Buyer and Seller agree to make the following deliveries to Escrow Company on or before the following deadlines. Failure of either Buyer or Seller to perform these delivery obligations shall give the other party the right to terminate the escrow pursuant to Section 10.

> a.  Within fifteen (15) business days of the date hereof, Seller shall deliver to Escrow Company copies of the purchase, option or other agreement or document which gave rise to Seller's ownership of the Shares or a stock certificate representing the Shares in Seller's name. Escrow Company will email Buyer copies of the same along with wire transfer instructions for the Escrow Company's escrow account for this escrow.

Document Integrity Verified ═══════════════════════════════════════════ EchoSign Transaction Number: JYIF5S669XL5JK ══════

b. Within five (5) business days of Escrow Company's email to Buyer described in Section 2.a., Buyer shall deliver (i) the Purchase Price by wire transfer of immediately available funds into Escrow Company's escrow account (the "Escrow Funds"), and (ii) an executed copy of the Investor Right's Agreement (the "IRA" as further defined in the Purchase Agreement and as attached as Exhibit D thereto) if the IRA by its terms requires the Buyer to do so for the proper transfer of the Shares. Escrow Company shall then inform Buyer and Seller by email of receipt of the same.

c. Within fifteen (15) business days of Escrow Company transmitting the email described in Section 2.b., Seller shall deliver to Escrow Company a: (i) valid, original stock certificate(s) representing the Shares duly executed in blank; and (ii) stock power(s) executed by Seller and directing the Company to transfer the Shares into the name of Buyer on the books and records of the Company (such stock power to be in the form set out on Schedule A hereto; and (iii) whatever other documentation the Company reasonably requires to process the transfer of the Shares to Buyer, including without limitation a legal opinion to the effect that the Transaction complies with applicable securities laws..

d. Upon receipt of the stock certificate and stock power described in Section 2.c., Escrow Company will use commercially reasonable efforts to affect the transfer of the Shares to Buyer promptly, provided however that Buyer and Seller acknowledge that Escrow Company's efforts in this respect are subject to the cooperation of the Company.

e. Upon receipt by Escrow Company of a stock certificate representing the Shares in Buyer's name, Escrow Company will deliver the stock certificate and stock power to Buyer and the Escrow Funds less the Escrow Fee to Seller.

3.      Escrow Account. All funds received into escrow shall be deposited in a segregated account for the specific Transaction which account shall be a non-interest bearing, general escrow account of Escrow Company.

4.      Purchase Agreement.      Escrow Company acknowledges receipt of the Purchase Agreement. This Agreement does not amend, modify, or supersede any term of the Purchase Agreement. Buyer and Seller acknowledge and agree that Escrow Company is a party only to this Agreement and not the Purchase Agreement and shall have no responsibility for the enforcement of, or any obligation under, the Purchase Agreement or any other agreements between Buyer and Seller.

5. Excluded Obligations. Buyer and Seller acknowledge and agree, that Escrow Company is not the transfer agent for the Shares. Escrow Company shall only take such actions as are required by this Agreement. Actions that will not be undertaken by Escrow Company include, but are not limited to:

a. request or obtain any authorization from the Commissioner of Corporations as to the transfer of the Shares;

b. request a Good Standing Certificate;

✔ Document Integrity Verified ════════════════════════════════ EchoSign Transaction Number: JYIF5S669XL5JK

Escrow Company is hereby relieved of all liability and responsibility for requesting, acquiring or delivering any of the above items or any item not specified in this Agreement.

6. Suspension of Performance; Disbursement Into Court. If, at any time, (i) there shall exist any dispute between Buyer and Seller with respect to the holding or disposition of all or any portion of the Escrow Funds or any other obligations of Escrow Company hereunder, (ii) Escrow Company is unable to determine, to Escrow Company's sole satisfaction, the proper disposition of all or any portion of the Escrow Funds or Escrow Company's proper actions with respect to its obligations hereunder, or (iii) the parties have not within 30 days of the furnishing by Escrow Company of a notice of resignation pursuant to the terms hereof, appointed a successor escrow company to act hereunder, then Escrow Company may, in its sole discretion, take either or both of the following actions:

a. suspend the performance of any of its obligations (including without limitation any disbursement obligations) under this Agreement until such dispute or uncertainty shall be resolved to the sole satisfaction of Escrow Company or until a successor escrow company shall have been appointed (as the case may be).

b. petition (by means of an interpleader action or any other appropriate method) any court of competent jurisdiction in any venue convenient to Escrow Company, for instructions with respect to such dispute or uncertainty, and to the extent required or permitted by law, pay into such court, for holding and disposition in accordance with the instructions of such court, all Escrow Funds, after deduction and payment to Escrow Company of all fees and expenses (including court costs and attorneys' fees) payable to, incurred by, or expected to be incurred by Escrow Company in connection with the performance of its duties and the exercise of its rights hereunder, along with certificates, documents and any other items delivered to Escrow Company in connection with the escrow created hereunder.

Escrow Agent shall have no liability to Buyer or Seller or any other person with respect to any such suspension of performance or disbursement into court, specifically including any liability or claimed liability that may arise, or be alleged to have arisen, out of or as a result of any delay in the disbursement of the Escrow Funds or any delay in or with respect to any other action required or requested of Escrow Company.

7. Liability of Escrow Company. The Escrow Company undertakes to perform only such duties as are expressly set forth herein and no duties shall be implied. The Escrow Company shall have no liability under and no duty to inquire as to the provisions of any agreement other than this Agreement. The Escrow Company shall not be liable for any action taken or omitted by it in good faith except to the extent that a court of competent jurisdiction determines that the Escrow Company's gross negligence or willful misconduct was the primary cause of any loss to the Buyer or Seller. Escrow Company's sole responsibility shall be for the safekeeping and disbursement of the Escrow Funds in accordance with the terms of this Agreement. Escrow Company shall have no implied duties or obligations and shall not be charged with knowledge or notice of any fact or circumstance not specifically set forth herein. Escrow Company may rely upon any notice, instruction, request or other instrument, not only as to its due execution, validity and effectiveness, but also as to the truth and accuracy of any information contained therein, which Escrow Company shall believe to be genuine and to have been signed or presented by the person or parties purporting to sign the same. In no event shall Escrow Company be liable for incidental, indirect, special,

Document Integrity Verified          EchoSign Transaction Number: JYIF5S669XL5JK

consequential or punitive damages (including, but not limited to lost profits), even if the Escrow Company has been advised of the likelihood of such loss or damage and regardless of the form of action. Escrow Company shall not be obligated to take any legal action or commence any proceeding in connection with the Escrow Funds, any account in which Escrow Funds are deposited, this Agreement or any other agreement, or to appear in, prosecute or defend any such legal action or proceeding. Escrow Company shall not be responsible or liable in any manner for the performance by any party of their respective obligations under any other agreement nor shall Escrow Company be responsible or liable in any manner for the failure of any party to honor any of the provisions of this Agreement. Escrow Company may consult legal counsel selected by it in the event of any dispute or question as to the construction of any of the provisions hereof or of any other agreement or of its duties hereunder, or relating to any dispute involving any party hereto, and shall incur no liability and shall be fully indemnified from any liability whatsoever in acting in accordance with the opinion or instruction of such counsel. Buyer and Seller, jointly and severally, shall promptly pay, upon demand, the reasonable fees and expenses of any such counsel.

The Escrow Company is authorized, in its sole discretion, to comply with orders issued or process entered by any court with respect to the Escrow Funds, without determination by the Escrow Company of such court's jurisdiction in the matter. If any portion of the Escrow Funds is at any time attached, garnished or levied upon under any court order, or in case the payment, assignment, transfer, conveyance or delivery of any such property shall be stayed or enjoined by any court order, or in case any order, judgment or decree shall be made or entered by any court affecting such property or any part thereof, then and in any such event, the Escrow Company is authorized, in its sole discretion, to rely upon and comply with any such order, writ, judgment or decree which it is advised by legal counsel selected by it is binding upon it without the need for appeal or other action; and if the Escrow Company complies with any such order, writ, judgment or decree, it shall not be liable to any of the parties hereto or to any other person or entity by reason of such compliance even though such order, writ, judgment or decree may be subsequently reversed, modified, annulled, set aside or vacated.

8. Indemnification of Escrow Company. From and at all times after the date of this Agreement, Buyer and Seller, jointly and severally, shall, to the fullest extent permitted by law, defend, indemnify and hold harmless Escrow Company and each director, officer, employee, attorney, agent and affiliate of Escrow Company (collectively, the "Indemnified Parties") against any and all actions, claims (whether or not valid), losses, damages, liabilities, costs and expenses of any kind or nature whatsoever (including without limitation reasonable attorneys' fees, costs and expenses) incurred by or asserted against any of the Indemnified Parties from and after the date hereof, whether direct, indirect or consequential, as a result of or arising from or in any way relating to any claim, demand, suit, action or proceeding (including any inquiry or investigation) by any person, including without limitation Buyer or Seller, whether threatened or initiated, asserting a claim for any legal or equitable remedy against any person under any statute or regulation, including, but not limited to, any federal or state securities laws, or under any common law or equitable cause or otherwise, arising from or in connection with the negotiation, preparation, execution, performance or failure of performance of this Agreement or any transactions contemplated herein, whether or not any such Indemnified Party is a party to any such action, proceeding, suit or the target of any such inquiry or investigation; *provided, however*, that no Indemnified Party shall have the right to be indemnified hereunder for any liability finally determined by a court of competent jurisdiction, subject to no further appeal, to have resulted solely from the gross negligence or willful misconduct of such Indemnified Party. Each Indemnified Party shall, in its sole discretion, have the right to select and employ separate counsel with respect to any action or claim brought or asserted against it, and

Document Integrity Verified      EchoSign Transaction Number: JYIF5S669XL5JK

the reasonable fees of such counsel shall be paid upon demand by the Buyer and Seller jointly and severally.  The obligations of Buyer and Seller under this section shall survive any termination of this Agreement and the resignation or removal of Escrow Company.

The parties agree that neither the payment by Buyer or Seller of any claim by Escrow Company for indemnification hereunder nor the disbursement of any amounts to Escrow Company from the Escrow Funds in respect of a claim by Escrow Company for indemnification shall impair, limit, modify, or affect, as between Buyer and Seller, the respective rights and obligations of Buyer, on the one hand, and Seller, on the other hand, under this or any other agreement.

9.      Compensation to Escrow Company.

a.      Fees and Expenses.  Buyer and Seller shall compensate Escrow Company for its services hereunder in accordance with Schedule B attached hereto and, in addition, shall reimburse Escrow Company for all of its reasonable out-of-pocket expenses, including attorneys' fees, travel expenses, telephone and facsimile transmission costs, postage (including express mail and overnight delivery charges), copying charges and the like.  The Escrow Fee is earned and payable upon the Buyer's delivering the Escrow Funds to the Escrow Company.  The Escrow Fee shall be paid to Escrow Company directly out of funds held for this escrow without any further action or instructed required by Buyer and/or Seller.  The additional provisions and information set forth on Schedule B are hereby incorporated by this reference, and form a part of this Agreement.  All of the compensation and reimbursement obligations set forth in this section shall be payable by Buyer and Seller, jointly and severally, upon demand by Escrow Company.  The obligations of Buyer and Seller under this section shall survive any termination of this Escrow Agreement and the resignation or removal of Escrow Company.

b.      Disbursements from Escrow Funds to Pay Escrow Company.  The Escrow Company is authorized to, and may, disburse to itself from the Escrow Funds, from time to time, the amount of any compensation and reimbursement of out-of-pocket expenses due and payable hereunder (including any amount to which Escrow Company is entitled to seek indemnification pursuant to the terms of this Agreement).  Escrow Company shall notify Buyer and Seller of any disbursement from the Escrow Funds to itself in respect of any compensation or reimbursement hereunder and shall, upon written request from Buyer or Seller, furnish to the requesting party copies of all related invoices and other statements.

c.      Security and Offset.  Buyer and Seller hereby grant to Escrow Company and the Indemnified Parties a security interest in and lien upon the Escrow Funds to secure all obligations hereunder, and Escrow Company and the Indemnified Parties shall have the right to offset the amount of any compensation or reimbursement due any of them hereunder (including any claim for indemnification pursuant to the terms of this Agreement) against the Escrow Funds.  If for any reason the Escrow Funds available to Escrow Company and the Indemnified Parties pursuant to such security interest or right of offset are insufficient to cover such compensation and reimbursement, Buyer and Seller shall promptly pay such amounts to Escrow Company and the Indemnified Parties upon receipt of an itemized invoice.

Document Integrity Verified          EchoSign Transaction Number: JYIF5S669XL5JK

10. Termination of Escrow

a. Either Buyer or Seller may deliver to Escrow Company a request to terminate the escrow, the Purchase Agreement and this Agreement and/or distribute any funds then held in escrow. Such request must include how any funds are to be disbursed. In that event, Escrow Company will email, fax and send a copy by certified mail to the other party. If within ten (10) business days of the sending of such fax, email and mail, the other party has not delivered written correspondence stating an objection to the termination, then this escrow will be terminated and Escrow Company will release funds per the originating party's original instructions and the terms of this Agreement with respect to fees and expenses owed to Escrow Company.

b. In the event, the other Party does deliver a written objection to the request to terminate the escrow described in Section 10.a., then Escrow Company is to hold all funds, and all documents pertaining to the escrow until Escrow Company receives either: (i) termination instructions jointly executed by both Buyer and Seller, (2) an order by a court having jurisdiction over Buyer and Seller, or (3) if Buyer and Seller have agreed to binding arbitration, then written instructions from the arbitrator. Buyer and Seller agree that the assertion by either of them to Escrow Company that the other is in default of this Agreement, the Purchase Agreement or any other agreement shall not create any obligation upon Escrow Company and shall not modify the terms of this Section 10.b.

c. UPON THE DISBURSAL OF ALL FUNDS TO BUYER AND RETURN OF ALL STOCK CERTIFICATES TO SELLER, (1) THIS ESCROW SHALL BE CANCELLED AND IT IS HEREIN UNDERSTOOD AND AGREED BY ALL PARTIES THAT CANCELLATION IS A COMPLETE RELEASE OF ANY AND ALL OBLIGATIONS BY ESCROW COMPANY, AND (2) THE UNDERSIGNED PARTIES RELEASE ESCROW COMPANY AND SHARESPOST (THE "RELEASED PARTIES") FROM ANY AND ALL RESPONSIBILITY OR LIABILITY IN CONNECTION WITH THIS ESCROW AND AGREE NOT TO BRING ANY ACTION AGAINST THIS RELEASED PARTIES, ANY OF THEIR OFFICERS OR EMPLOYEES, OR AFFILIATES FOR ANY MATTER ARISING IN CONNECTION WITH THIS ESCROW. BUYER AND SELLER SHALL BE JOINTLY AND SEVERALLY LIABLE FOR ANY COURT COSTS OF THE RELEASED PARTIES, INCLUDING BUT NOT LIMITED TO REASONABLE ATTORNEY'S FEES, IN CONNECTION WITH THIS AGREEMENT.

11. Resignation of Escrow Company. Escrow Company may resign and be discharged from the performance of its duties hereunder at any time by giving ten (10) days prior written notice to the Buyer and Seller specifying a date when such resignation shall take effect. Upon any such notice of resignation, the parties jointly shall appoint a successor Escrow Company hereunder prior to the effective date of such resignation. The retiring Escrow Company shall transmit all records pertaining to the Escrow Funds and shall pay all Escrow Funds to the successor escrow company, after making copies of such records as the retiring Escrow Company deems advisable and after deduction and payment to the retiring Escrow Company of all fees and expenses (including court costs and attorneys' fees) payable to, incurred by, or expected to be incurred by the retiring Escrow Company in connection with the performance of its duties and the exercise of its rights hereunder. After any retiring Escrow Company's resignation, the provisions of this Agreement shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Escrow Company under this Agreement.

Document Integrity Verified     EchoSign Transaction Number: JYIF5S669XL5JK

Any corporation or association into which the Escrow Company may be merged or converted or with which it may be consolidated, or any corporation or association to which all or substantially all of the escrow business of the Escrow Company's corporate trust line of business may be transferred, shall be the Escrow Company under this Agreement without further act.

12.     **IMPORTANT INFORMATION FOR OPENING AN ACCOUNT.**

*To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each person who opens an account.*

*For a non-individual person such as a business entity, a charity, a Trust, or other legal entity, we ask for documentation to verify its formation and existence as a legal entity. We may also ask to see financial statements, licenses, identification and authorization documents from individuals claiming authority to represent the entity or other relevant documentation.*

Buyer and Seller acknowledge that Escrow Company may be required to obtain identifying information from them in connection with the USA Patriot Act, Pub.L.107-56 (the "Act"), and Buyer and Seller agree to provide any additional information requested by the Escrow Company in connection with the Act or any similar legislation or regulation to which Escrow Company is subject, in a timely manner. Buyer and Seller each represent that all identifying information provided to Escrow Company, including without limitation, Social Security Numbers or Taxpayer Identification Numbers assigned by the Internal Revenue Service or any other taxing authority, is true and complete on the date hereof and will be true and complete at the time of any disbursement of the Escrow Funds.

13. Miscellaneous.

(a)     Notices, Demands, and deliveries. All notices and demands required to be given hereunder shall be deemed to be duly given at the time of delivery if personally delivered, or forty-eight (48) hours after mailing if deposited with the U.S. Postal Service, postage prepaid, for mailing via certified mail, return receipt requested. All deliveries allowed to be made via email shall be considered delivered upon return receipt confirmation from the Escrow Company of the receipt at the email address provided to the Escrow Company by the Buyer or Seller as applicable.

(b)     Entire Agreement; Successors and Assigns. This Agreement contains the entire understanding among the parties hereto and supersedes any prior written or oral agreement among the parties concerning the subject matter contained herein. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

(c)     Waiver. No waiver of any breach or default of this Agreement by any party hereto shall be considered to be a waiver of any other breach or default of this Agreement.

(d)     Signature; Parties Identity. This Agreement may be executed by in counterparts and when so executed by Buyer, Seller and Escrow Company shall be a valid and binding agreement upon all parties. The parties hereto acknowledge and accept one or more of them may not have known the others' identity at the time they executed this Agreement. Each party hereto agrees that this fact in no way effects the validity or enforceability of this Agreement, and further agrees and covenant not to challenge its validity or enforceability on any such grounds.

Document Integrity Verified     EchoSign Transaction Number: JYIF5S669XL5JK

(e)     Amendment.  This Agreement may be amended or modified only by a written agreement duly executed by the parties to this Agreement.

(f)     Choice of Law.  This Agreement shall be interpreted in accordance with, and governed by, the laws of the State of California without reference to the choice of law rules in effect at any time in the State of California.

(g)     Headings.  The headings contained in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.

The parties hereto have caused this Agreement to be executed by hand, as of the latest date set forth next to a party's name below.

BUYER

_____
Name
Authorized Officer (if applicable)

SELLER

_____
Name
Authorized Officer (if applicable)

U.S. BANK NATIONAL ASSOCIATION, as "ESCROW COMPANY"

_____

Document Integrity Verified     EchoSign Transaction Number: JYIF5S669XL5JK

## SCHEDULE A

## IRREVOCABLE ASSIGNMENT SEPARATE FROM CERTIFICATE

For Value Received, _____

hereby sell, assign and transfer to _____

_____

(insert name, address, social security number or tax I.D. number)

shares of the _____ stock of

represented by certificate(s) No(s). _____ inclusive, standing in the name of the undersigned on
the books of said *Company (Trustee)*.

The undersigned does (do) hereby irrevocably constitute and appoint

_____

attorney to transfer the said stock or bond(s) as the case may be, on the books of the within
named *Company (Trustee)* with full power of substitution in the premises.

> **IMPORTANT - READ CAREFULLY:** The signature(s)
> on this assignment must correspond with the name(s)
> on the face of the certificate in every particular, without
> alteration or enlargement, or any change. A separate
> assignment is required for each issue. A separate
> assignment is also required for each certificate on a
> sell order. The signature(s) of the assignor(s) must be
> guaranteed hereon.

Dated _____     _____

*(Signature)*

### SIGNATURE GUARANTEED

 Document Integrity Verified     EchoSign Transaction Number: JYIF5S669XL5JK

## SCHEDULE B

### Fee Schedule to serve as
### Escrow Agent, Exchange Agent
for
### SHARESPOST

(Secondary Market Private Company Investments - Escrow & Exchange Program)

01010      **Escrow Fee (equally split between Buyer and Seller)**                                    $3,000.00
The acceptance fee includes the administrative review of documents, initial set-up of
the account, and other reasonably required services up to and including the closing.
This is a one-time fee, payable at closing.

**The Buyer must include their portion of the Escrow Fee with the purchase
proceeds, while the Seller's portion will be withheld from the final distribution.**

U.S. Bank Corporate Trust Services reserves the right to refer any or all escrow
documents for legal review before execution. Legal fees (billed on an hourly basis)
and expenses for this service will be billed to, and paid by, the customer. If
appropriate and upon request by the customer, U.S. Bank Corporate Trust Services
will provide advance estimates of these legal fees.

#### Extraordinary Services
Extraordinary services are duties or responsibilities of an unusual nature, including termination, but not
provided for in the governing documents or otherwise set forth in this schedule. A reasonable charge will
be assessed based on the nature of the service and the responsibility involved. At our option, these
charges will be billed at a flat fee or at our hourly rate then in effect.

Account approval is subject to review and qualification. Fees are subject to change at our
discretion and upon written notice. **Fees paid in advance will not be prorated.** The fees
set forth above and any subsequent modifications thereof are part of your agreement.
Finalization of the transaction constitutes agreement to the above fee schedule, including
agreement to any subsequent changes upon proper written notice. In the event your
transaction is not finalized, any related out-of-pocket expenses will be billed to you directly.
All sums in your account will remain uninvested and no accrued interest or other
compensation will be credited to the account. Payment of fees constitutes acceptance of
the terms and conditions set forth.

## "IMPORTANT INFORMATION ABOUT PROCEDURES FOR OPENING A NEW ACCOUNT"

To help the government fight the funding of terrorism and money laundering activities,
Federal law requires all financial institutions to obtain, verify and record information that
identifies each person who opens an account.

For a non-individual person such as a business entity, a charity, a Trust or other legal entity
we will ask for documentation to verify its formation and existence as a legal entity. We may
also ask to see financial statements, licenses, identification and authorization documents
from individuals claiming authority to represent the entity or other relevant documentation."

Document Integrity Verified                                                           EchoSign Transaction Number: JYIF5S669XL5JK



**Exhibit B**

**INDEMNIFICATION AGREEMENT**

Document Integrity Verified       EchoSign Transaction Number: JYIF5S669XL5JK


sharespost

## INDEMNIFICATION AGREEMENT

THIS INDEMNIFICATION AGREEMENT (this "Agreement") is made between the Buyer (as defined below) and the Seller (as defined below) and Sharespost, Inc. ("SharesPost"). This Agreement is made as of the latest date set forth next to Buyer's, Seller's or SharesPost's name below.

### *RECITALS:*

A.    For purposes of this Agreement, the following defined terms shall have the meanings ascribed to them below.

| | |
|---|---|
| Company: | Zynga Game Network Inc. |
| Escrow Provider: | U.S. Bank National Association |
| Share Type: | Common |
| Number of Shares: | 20,000 |

B.    The Seller owns the Number of Shares of the Share Type of the Company ("the Shares"). The Buyer desires to purchase the Shares from the Seller, and the Seller desires to sell and transfer the Shares to the Buyer (the "Transaction").

C.    To effect the Transaction, Buyer and Seller are simultaneously entering into that certain Stock Purchase Agreement (the "Purchase Agreement"). All terms used herein that are not otherwise defined shall have the meaning ascribed to them in the Purchase Agreement, including without limitation all references to exhibits or attachments to the Purchase Agreement.

D.    Buyer and Seller are entering into that certain Escrow Services Agreement with the Escrow Provider which, among other things, provides the terms under which Escrow Provider will facilitate the closing of the Transaction.

E.    Buyer and Seller wish to induce Sharespost to allow them to utilize the website, document forms and technology platform of SharesPost to facilitate communication with each other and with Escrow Provider (the "SharesPost Services") and so are entering into this Agreement to indemnify Sharespost from any liability arising in connection with the Transaction.

F.    Buyer and Seller wish to acknowledge that the Company is not endorsing Sharespost, has not provided to Buyer, Seller or Sharespost any information, research, data or analysis, is not vouching for the accuracy or completeness of any of the information, research, data or analysis available from the SharesPost website, and in order to induce SharesPost to provide them with the SharesPost Services, wish to agree not to bring any claim against the Company relating to, and not to hold or attempt to hold the Company liable in any way for, the Transaction. Buyer and Seller further wish to make the Company a third part beneficiary of certain aspects of this Agreement.

### *AGREEMENT*

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth, the parties hereto hereby agree as follows:

Indemnification Agreement          SharesPost, Inc. © All Rights Reserved. Version S0 6.2 (8/4/10)          2 of 6

✔ Document Integrity Verified ═══════════════════════════════════════ EchoSign Transaction Number: JYIF5S669XL5JK ═══

sharespost

1.    SharesPost Services. Subject to the terms of applicable Subscription Agreement, Terms of Use and Privacy Policy, Sharespost agrees to give each of Buyer and Seller access to the Sharespost website generally and to certain portions of that website reserved specifically for their respective accounts. The consideration for this access shall be, among other things, Buyer's and Seller's entry into this Agreement.

2.    Representations and Warranties. Buyer and Seller jointly and severally represent and warrant to Sharespost as set forth below as of the date hereof and as of the date of the Closing.

(a)    *Shares not Registered.* Buyer and Seller acknowledge that the Shares are not registered with the SEC pursuant to the Securities Act. They have made their own independent analysis of securities laws and have determined an exemption is available for the Transaction and the purchase and sale of Shares pursuant to the Purchase Agreement. Accordingly, they acknowledge that they are not relying in any way on any representation or warranty of Sharespost with regard to the availability of any such exemption even if a general view of the applicability of certain securities laws is available on the Sharespost site. For this and other reasons, Buyer and Seller agree that Sharespost will have no liability with respect to the applicability of any securities or other laws to the Transaction.

(b)    *Buyer is an Accredited Investor.* Buyer has reviewed and affirmed the accuracy of Buyer's Investment Representation Statement and acknowledges that Sharespost is relying on such statement in its actions with regard to the Transaction.

(c)    *Buyer and Seller Maintain Sharespost Accounts.* Buyer and Seller are each active members of the Sharespost community and maintain individual accounts with Sharespost for the purpose of, among other things, following news about certain companies, exchanging information about such companies, for reviewing and acting upon posts by fellow Sharespost members on the Sharespost bulletin boards and making such posts themselves.

(d)    *Sharespost Not a Broker Dealer.* Buyer and Seller are aware that Sharespost is not a broker dealer registered under the Exchange Act of 1934, as amended. They acknowledge that Sharespost is not acting as a broker with respect to the Transaction, is not taking possession of the Shares or the Purchase Price at any time and is not in any way processing the Transaction and that all such duties will be carried out by a third party Escrow Provider on behalf of Buyer and Seller.

(e)    *Sharespost not an Investment Advisor.* Buyer and Seller are aware that Sharespost is not an investment advisor of any kind registered with any state or federal authority and confirm that Sharespost is giving no investment advice to Buyer or Seller of any kind, including without limitation, advice concerning the Transaction, the Shares and/or the Company.

(f)    *Sharespost not an Exchange.* Buyer and Seller are aware that SharesPost is not an Exchange as defined by the Exchange Act of 1934, as amended, or registered with the SEC. They acknowledge that, for purposes of the Transaction, Sharespost is acting solely as a passive bulletin board.

(g)    *No Reliance on Information Displayed on Sharespost Site.* In deciding to enter into the Purchase Agreement, Buyer and Seller made their own independent investigation into the value of the Shares and the prospects of the Company. They have not relied in any way on any information disseminated by Sharespost via its website or otherwise. They acknowledge that the

 Document Integrity Verified                                                                 EchoSign Transaction Number: JYIF5S669XL5JK

sharespost

information provided by Sharespost with respect to the Company is an aggregation of content from third party data providers and user submitted content and that Sharespost makes no effort to validate the accuracy or completeness of any such information and makes no representation or warranty of any kind with respect to such information. For this and other reasons, Buyer and Seller agree that Sharespost shall have no liability with respect to information disseminated by Sharespost concerning the Company and/or the Shares.

(h) *No Sharespost Representations or Warranties.* Buyer and Seller acknowledge that Sharespost has made no representation or warranty of any kind, express or implied, direct or indirect, to Buyer or Seller, including without limitation any representation or warranty regarding the Transaction, the Shares and/or the Company.

(i) *Independent Review of Form of Agreements.* Buyer and Seller have made their own independent review of the form of contracts provided by Sharespost for Buyer and Seller to effect the Transaction and have had the opportunity to review them with their legal, tax and other advisors prior to executing any of these contracts. They acknowledge that Sharespost has made no representation or warranty concerning such contracts, including without limitation, any representation or warranty regarding their fitness for implementing any aspect of the Transaction. They further acknowledge that SharesPost is not representing or serving as counsel for any party to the Transaction and there is no attorney-client relationship established between SharesPost and Buyer and/or Seller. For this and other reasons, they acknowledge and agree that Sharespost will have no liability of any kind to them in connection with such contracts.

(j) *Independent from Escrow Provider.* Buyer and Seller acknowledge that Sharespost is not a party to the Escrow Services Agreement and is a separate and independent entity from Escrow Provider. They acknowledge that they have relied on no SharesPost representation or warranty concerning Escrow Provider's accreditation, qualifications or ability to facilitate or implement the Transaction and, for this and other reasons, agree that Sharespost shall not be liable for any act or omission of Escrow Provider.

(k) *Sharespost not a Party to Transaction.* Buyer and Seller acknowledge that Sharespost is not a party to the Purchase Agreement and, for this and other reasons, shall have no liability to either Buyer or Seller for any aspect of the Purchase Agreement or the Transaction.

3. Indemnification. Buyer and Seller each hereby agree to defend, indemnify and hold harmless Sharespost and its partners, members, officers, directors, employees, agents, successors and assigns from and against any claim, damage, liability, loss, cost or expense (including reasonable attorneys fees) arising directly or indirectly out of: (i) any material failure of theirs to perform their obligations as set forth in the Purchase Agreement or the Escrow Agreement; (ii) any inaccuracy or breach of any of their representations or warranties made in this Agreement, the Purchase Agreement or any attachment thereto, and (iii) any and all actions, suits, litigations, arbitrations, proceedings, investigations, claims or liabilities of whatever nature arising out of any of the foregoing. The remedies provided in this Section 3 shall be cumulative and shall not preclude the assertion by Sharespost of any other rights or the seeking of any other remedies.

4. Standard of Care. In the event that, despite the terms of this Agreement, SharesPost shall be held liable for any damages arising from the Transaction, Sharespost shall nonetheless not be liable for any error of judgment or for any act done or step taken or omitted by it or for any mistake

Document Integrity Verified                                                    EchoSign Transaction Number: JYIF5S689XL5JK

of fact or law or for anything which Sharespost may do or refrain from doing in connection with the Transaction, except its own gross negligence or willful misconduct.

5.    Company Disclaimer. Indemnification.

(a)    *No Information; No Obligation.* Buyer, Seller and SharesPost acknowledge that the Company (i) has not provided to the Buyer, the Seller or SharesPost any information regarding the Company, the Shares or the Transaction, (ii) has not reviewed or validated any of the information, research or analysis about the Company, the Shares or the Transaction available from the SharesPost website or otherwise learned or made available to Buyer or Seller, (iii) has no obligation to review or validate any of such information, research or analysis, (iv) explicitly disclaims any responsibility for any information about the Company, the Shares or the Transaction that Buyer, Seller, SharesPost, Escrow Company or any other person may have provided to any party to this Agreement and (iv) shall have no liability to Buyer, Seller or SharesPost whatsoever with respect to the investment decision by Buyer and Seller to undertake the Transaction. Each of Buyer, Seller and SharesPost further agrees that it will not ever assert a claim against the Company arising out of, or based in any way upon, the Transaction (including but not limited to any claim (whether in a judicial proceeding or otherwise) based upon an allegation that any information, data or fact disclosed to Buyer, Seller or SharesPost by any of them was misleading, or that Buyer, Seller or SharesPost omitted to disclose any information , data or fact.

(b)    *Indemnification of Company.* Buyer and Seller each hereby agree to defend, indemnify and hold harmless the Company and its officers, directors, employees, agents, shareholders and their respective successors and assigns from and against any claim, damage, liability, loss, cost or expense (including reasonable attorneys fees) arising directly or indirectly out of: (i) any material failure of theirs to perform their obligations as set forth in the Purchase Agreement or the Escrow Agreement; (ii) any inaccuracy or breach of any of their representations or warranties made in this Agreement, the Purchase Agreement or any attachment thereto, and (iii) any and all actions, suits, litigations, arbitrations, proceedings, investigations, claims or liabilities of whatever nature arising out of any of the foregoing. The remedies provided in this Section 5 shall be cumulative and shall not preclude the assertion by the Company of any other rights or the seeking of any other remedies.

6.    Miscellaneous.

(a)    *Notices and Demands.* All notices and demands required to be given hereunder shall be deemed to be duly given at the time of delivery if personally delivered, or forty-eight (48) hours after mailing if deposited with the U.S. Postal Service, postage prepaid, for mailing via certified mail, return receipt requested.

(b)    *Entire Agreement; Successors and Assigns.* This Agreement contains the entire understanding among the parties hereto and supersedes any prior written or oral agreement among the parties concerning the subject matter contained herein. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

(c)    *Waiver.* No waiver of any breach or default of this Agreement by any party hereto shall be considered to be a waiver of any other breach or default of this Agreement.

Document Integrity Verified                                                              EchoSign Transaction Number: JYIF5S669XL5JK

sharespost

    (d)    *Electronic Signature; Parties' Identity.* This Agreement may be executed by electronic signature and/or in counterparts and when so executed by Buyer, Seller and SharesPost shall be a valid and binding agreement upon all parties. The parties hereto acknowledge and accept that one or more of them may have executed this Agreement prior to knowing the identity of another party and agree that this fact in no way affects the validity or enforceability of this Agreement, and further agree and covenant not to challenge its validity or enforceability on any such grounds.

    (e)    *Data.* Buyer and Seller acknowledge and agree that SharesPost may publish information pertaining to the Transaction provided however that the treatment of any personally identifiable information shall be governed by the terms of the Privacy Policy appearing on the SharesPost website, as amended from time to time.

    (e)    *Amendment.* This Agreement may be amended or modified only by a written agreement duly executed by the parties to this Agreement.

    (f)    *Choice of Law.* This Agreement shall be interpreted in accordance with, and governed by, the laws of the State of California without reference to the choice of law rules in effect at any time in the State of California.

    (g)    *Headings.* The headings contained in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.

    (h)    *Third Party Beneficiary.* The Company is not a party to this Agreement. The Company is, however, a named third party beneficiary of this Agreement, including but not limited to Recital F and Section 5 of this Agreement.

    The parties hereto have caused this Indemnification Agreement to be duly executed electronically or by hand, as of the date set forth next to SharesPost's name.

\*\*\*\*

Document Integrity Verified    EchoSign Transaction Number: JYIF5S669XL5JK

IN WITNESS WHEREOF, the authorized representatives of Buyer and Seller, intending to create a legally binding agreement, have each electronically executed this INDEMNIFICATION AGREEMENT below:

BUYER

*Jackie Barth*
Jackie Barth (Sep 13, 2011)

SELLER

"SHARESPOST"

By:
Date:



## Exhibit C

### BUYERS INVESTMENT REPRESENTATION STATEMENT

Document Integrity Verified                                                                                            EchoSign Transaction Number: JYIF5S669XL5JK


sharespost

## BUYERS INVESTMENT REPRESENTATION STATEMENT

| COMPANY | : | Zynga Game Network Inc. |
| ESCROW PROVIDER : | | U.S. Bank National Association |
| SHARE TYPE | : | Common |
| NUMBER OF SHARES: | | 20,000 |
| DATE | : | 09/12/2011 |

In connection with the purchase of the above-listed shares, I, the Buyer (as defined below) , represent to the other party signing below, the Escrow Provider and SharesPost, Inc. (the "Statement Recipients") as follows:

1. *The Statement Recipients may rely on these representations.* I understand that the Seller's sale of the Shares to me has not been registered under the Securities Act of 1933, as amended (the "**Securities Act**"), because the Statement Recipients believe, relying in part on my representations in this document, that an exemption from such registration requirement is available for such sale. I understand that the availability of this exemption depends in part upon the representations I am making in this document being true and correct.

2. *I am purchasing for investment.* I am purchasing the shares solely for investment purposes, and not for further distribution. My entire legal and beneficial ownership interest in the shares is being purchased and shall be held solely for my account, except to the extent I intend to hold the shares jointly with my spouse. I am not a party to, and do not presently intend to enter into, any contract or other arrangement with any other person or entity involving the resale, transfer, grant of participation with respect to or other distribution of any of the shares. My investment intent is not limited to my present intention to hold the shares for the minimum capital gains period specified under any applicable tax law, for a deferred sale, for a specified increase or decrease in the market price of the shares, or for any other fixed period in the future.

3. *I can protect my own interests.* I can properly evaluate the merits and risks of an investment in the Shares and can protect my own interests in this regard, whether by reason of my own business and financial expertise, the business and financial expertise of certain professional advisors unaffiliated with the Statement Recipients with whom I have consulted, or my preexisting business or personal relationship with the Company or any of its directors or controlling persons.

4. *I am informed about the Company.* I am sufficiently aware of the Company's business affairs and financial condition independent of any of the Statement Recipients to reach an informed and knowledgeable decision to acquire the Shares. I have received all information I deem appropriate for assessing the risk of an investment in the Shares.

5. *I recognize my economic risk.* I realize that the purchase of the Shares involves a high degree of risk, and that the Company's future prospects are uncertain. I am able to hold the shares indefinitely if required, and am able to bear the loss of my entire investment in the Shares.

Document Integrity Verified ══════════════════════════════════════════ EchoSign Transaction Number: JYIF5S669XL5JK

sharespost

6. *I know that the shares are restricted securities.* I understand that the shares are "restricted securities" in that the Company's sale of the shares to me has not been registered under the Securities Act in reliance upon an exemption for non-public offerings. In this regard, I also understand and agree that:

A. I must hold the shares indefinitely, unless any subsequent proposed resale by me is registered under the Securities Act, or unless an exemption from registration is otherwise available (such as Rule 144);

B. the Company is under no obligation to register any subsequent proposed resale of the shares by me; *and*

C. the certificate evidencing the shares may be imprinted with a legend which prohibits the transfer of the shares unless such transfer is registered or such registration is not required in the opinion of counsel for the Company.

7. *I am familiar with Rule 144.* I am familiar with Rule 144 adopted under the Securities Act, which in some circumstances permits limited public resales of "restricted securities" like the shares acquired from an issuer in a non-public offering. I understand that my ability to sell the shares under Rule 144 in the future is uncertain, and may depend upon, among other things: (i) the availability of certain current public information about the Company; (ii) the resale occurring more than one year after my purchase and full payment (within the meaning of Rule 144) for the shares; *and* (iii) if I am an affiliate of the Company, or a non-affiliate who has held the shares less than one year after my purchase and full payment: (A) the sale being made through a broker in an unsolicited "broker's transaction" or in transactions directly with a market maker, as said term is defined under the Securities Exchange Act of 1934, as amended, (B) the amount of shares being sold during any three-month period not exceeding the specified limitations stated in Rule 144, *and* (C) timely filing of a notice of proposed sale on Form 144, if applicable.

8. *I know that Rule 144 may never be available.* I understand that the requirements of Rule 144 may never be met, and that the shares may never be saleable. I further understand that at the time I wish to sell the shares, there may be no public market for the Company's stock upon which to make such a sale, or the current public information requirements of Rule 144 may not be satisfied, either of which would preclude me from selling the shares under Rule 144 even if the one-year minimum holding period had been satisfied.

9. *I know that I am subject to further restrictions on resale.* I understand that in the event Rule 144 is not available to me, any future proposed sale of any of the shares by me may not be possible without prior registration under the Securities Act, compliance with some other registration exemption (which may or may not be available), or *each* of the following: (i) my written notice to the Company containing detailed information regarding the proposed sale, (ii) my providing an opinion of my counsel to the effect that such sale will not require registration, and (iii) the Company notifying me in writing that its counsel concurs in such opinion. I understand that neither the Company nor its counsel is obligated to provide me with any such opinion. I understand that although Rule 144 is not exclusive, the Staff of the SEC has stated that persons proposing to sell private placement securities other than in a registered offering or pursuant to Rule 144 will have a substantial burden of proof in establishing that an exemption from registration is available for such offers or sales, and that such persons and their respective brokers who participate in such transactions do so at their own risk.

10. *Residence.* The address of my principal residence is set forth on the signature page below.

Document Integrity Verified                                                                EchoSign Transaction Number: JYIF5S669XL5JK



By signing below, I acknowledge my agreement with each of the statements contained in this Buyer Investment Representation Statement as of the date first set forth above, and my intent for the Company and the Statement Recipients to rely on such statements in issuing the shares to me.

11. Nonreliance on SharesPost and Escrow Provider – Buyer acknowledges that SharesPost and the Escrow Provider have not reviewed or given advice regarding securities law matters relating to the purchase of the above-listed shares; Buyer, along with its own counsel, is responsible for its compliance with securities laws, and Buyer is in no way relying on SharesPost or the Escrow Provider concerning such matters.

\*\*\*\*

Document Integrity Verified                                                                                                EchoSign Transaction Number: JYIF5S669XL5JK

By signing below, I acknowledge my agreement with each of the statements contained in this
Buyer Investment Representation Statement as of the date hereof, and my intent for the Statement
Recipients to rely on such statements in issuing the shares to me.

BUYER

Jackie Barth
Jackie Barth (Sep 13, 2011)

ACKNOWLEDGED AND ACCEPTED:
SELLER



**Exhibit D**

**DOCUMENTS PERTINENT TO THE SHARES**

Document Integrity Verified

## FINDER'S AGREEMENT

This Finder's Agreement ("Agreement") is between Emerson Equity, LLC ("Finder") and the Client (as defined below).

In consideration of the mutual agreements and covenants herein contained, the parties hereto agree as follows:

1. **DEFINITIONS:** For purposes of this Agreement, the following defined terms shall have the meanings ascribed to them below:

   **Registered Representative:** A representative of the Finder.

   **Client:** The member buyer or member seller, respectively, signing this Agreement.

   | | |
   |---|---|
   | **Issuer:** | Zynga Game Network Inc. |
   | **Share Type:** | Common |
   | **Number of Shares:** | 20,000 |
   | **Transaction Fee:** | 3.0% |

2. **AGENCY:** The Client wishes to sell or purchase, as the case may be, the Number of Shares of the Share Type of the Issuer indicated above (the "Shares"). The Client appoints the Finder as its exclusive agent to identify a purchaser or seller, as the case may be, for the purchase or sale of the Shares (a "Transaction") during the effective term of this Agreement.

3. **INDEPENDENT CONTRACTOR:** This Agreement does not establish a partnership, agency, broker relationship, employment, joint venture or similar relationship with the Client for any purpose. The Finder is and will remain an independent contractor in its relationship to the Client.

4. **DUTIES:** Finder will use commercially reasonable efforts to find a purchaser or seller, as the case may be, for Client's desired Transaction. The posting of an indication of interest on the relevant bulletin board maintained by SharesPost, Inc. at www.sharespost.com shall constitute "commercially reasonable efforts."

5. **TRANSACTION FEE:** The Client shall pay the Finder the Transaction Fee within five (5) business days of the closing of the Transaction. Client's obligation to pay the Transaction Fee to Finder shall apply to any Transaction including, without limitation, a sale to an affiliate of SharesPost, Inc. or the Issuer or its assignee(s) in connection with a right of first refusal or similar mechanism.

6. **AUTHORIZATION:** Client hereby authorizes U.S. Bank National Association or alternative provider of escrow service, as the case may be (the "Escrow Agent"), to pay, from the funds in escrow in connection with any sale of the Shares, the Transaction Fee to Finder upon the closing of the Transaction.

7. **CLIENT REPRESENTATIONS:** In connection with Client's intended sale of the Shares, Client hereby represents, warrants and covenants to Finder and to the other parties to any transaction contemplated hereunder as indicated below. Client understands that, but for the truth of Client's representations below, Finder would not enter into this Agreement or provide the services contemplated hereunder to Client.

   a) Client understands that the Shares are restricted, illiquid and do not trade on any national securities exchange, and Client is aware of the implications and risks associated therewith.

   b) Client is aware that while Shares may be listed and/or shown for sale in various marketplaces (including without limitation website listings of illiquid investments), there may be no market for the Shares, and there is no assurance that the Shares will be sold at a profit to Client, or at any specific price, or at all.

   c) Client understands that the illiquid nature of the Shares, and the fact that the Shares are not listed on any national exchange, and there is very limited information available about the Issuer, make attempts at valuation on any given time or date highly imperfect and potentially wholly inaccurate. Client is making and will make his own informed, independent determination as to the value of the Shares and the price at which Client elects to sell the Shares without reliance on any information, analysis or advice from Finder or any of Finder's affiliates, including without limitation SharesPost, Inc. and its affiliates. Client understands and agrees that Finder is acting only as a finder with respect to the sale of the shares and is not acting as a broker or in any capacity that would create any fiduciary obligations between Client and Finder.

   d) Client owns valid and clear title to the Shares and with the exception of any applicable right of first refusal in favor of the Issuer, there is no provision of any agreement applicable to the Shares or Client that would bar or impede the sale of the Shares as contemplated hereunder.

8. **TERM:** Unless renewed, this Agreement terminates upon the earlier of (i) the payment of the Transaction Fee to the Finder, or (ii) the date ninety (90) days from the date hereof. Upon a termination of this Agreement pursuant to subsection (ii) immediately above, the Client's obligation to pay Finder the Transaction Fee shall survive indefinitely if the Shares are at anytime sold to any individual or entity introduced to Client by Finder.

9. **MODIFICATION:** This Agreement may not be modified except by a written

amendment signed by both Client and Finder. No waiver of this Agreement shall be construed as a continuing waiver or consent to any subsequent breach thereof.

10. **ENTIRE AGREEMENT:** This Agreement sets forth the entire agreement and understanding between the parties relating to the subject matter herein and supersedes all prior discussions between the parties, and no representation, promise, inducement or statement has been made by or on behalf of either party hereto concerning the subject matter hereof which is not set forth in this agreement. Any subsequent change or changes in the Finder's duties or Transaction Fee will not affect the validity or scope of this Agreement.

11. **GOVERNING LAW:** This Agreement will be governed by the laws of the State of California without regard to its conflicts of law provisions.

12. **ARBITRATION AGREEMENT:** THIS AGREEMENT CONTAINS AN ARBITRATION CLAUSE. BY SIGNING THIS AGREEMENT THE PARTIES AGREE AS FOLLOWS: Controversies arising between Client and Finder, its affiliates, and their respective officers, directors, employees, agents or representatives shall be determined by arbitration in accordance with the rules then in effect, of the Financial Industry Regulatory Authority ("FINRA"), and Client hereby consents to such jurisdiction. All awards rendered by the arbitrators shall be binding and final, and judgment upon the award may be entered in any court of competent jurisdiction.

a) All parties to this agreement are giving up the right to sue each other in court, including the right to a trial by jury, except as provided by the rules of the arbitration forum in which a claim is filed.

b) Arbitration awards are generally final and binding; a party's ability to have a court reverse or modify an arbitration award is very limited.

c) The ability of the parties to obtain documents, witness statements and other discovery is generally more limited in arbitration than in court proceedings.

d) The arbitrators do not have to explain the reason for their award.

e) The panel of arbitrators will typically include a minority of arbitrators who were or are affiliated with the securities industry.

f) The rules of some arbitration forums may impose time limits for bringing a claim in arbitration. In some cases, a claim that is ineligible for arbitration may be brought in court.

g) The rules of the arbitration forum in which the claim is filed, and any amendments thereto, shall be incorporated into this Agreement

h) No person shall bring a putative or certified class action to arbitration, nor seek

to enforce any pre-dispute arbitration agreement against any person who has initiated in court a putative class action or who is a member of putative class who has not opted out of the class with respect to any claims encompassed by the putative class action until: (i) the class certification is denied; (ii) the class is decertified; or (iii) the customer is excluded from the class by the court. Such forbearance to enforce an agreement to arbitrate shall not constitute a waiver of any rights under this agreement except to the extent stated herein.

## 13. CONFLICTS OF INTEREST:

a) Client acknowledges, understands and accepts that Finder, its affiliates, and their respective officers, directors, employees, agents or representatives (collectively referred to herein as "Finder Persons") are engaged generally in the financial services business and will perform investment advisory, research, brokerage, trading, portfolio evaluation and other services for themselves and for other clients and earn transaction or other fees therefore. In addition, Finder Persons may, but are not obligated to, purchase or sell or recommend for purchase or sale for Client any security which a Finder Person may purchase or sell for their own accounts or the account of any other client.

b) Client acknowledges, understands and accepts that Finder Persons may, from time to time (i) take action in the performance of their duties on behalf of other clients or on behalf of themselves, which may differ (in nature and timing) from the action taken with respect to Client; (ii) recommend to Client and other clients the purchase or sale of securities in which Finder Persons, directly or indirectly, have or may acquire a position of interest; (iii) act as an underwriter, selling agent, placement agent or market maker with respect to any security, including the Shares; (iv) perform a variety of services for, or solicit business from, a variety of companies, including issuers of securities that they may recommend for purchase or sale by, or effect transactions for the account of, their clients, including the issuer of the Interests.

c) Client acknowledges, understands and accepts that there can be no assurance that a particular sale or investment opportunity that comes to the attention of a Finder Person will be allocated in any particular manner. There exists a potential conflict of interest in the allocation of investment opportunities between the Client and other accounts that a Finder Person advises. Client is aware that Finder is affiliated with SharesPost, Inc., SP Investments Management, LLC and their affiliates.

14. **SEVERABILITY:** If one or more of the provisions in this Agreement are deemed void by law, then the remaining provisions will continue in full force and effect.

15. **HEADINGS:** Section headings are not to be considered a part of this Agreement and are not intended to be a full and accurate description of the contents hereof.

16. **ORIGINALS:** Once signed, any reproduction of this Agreement made by reliable means (for example, photocopy, facsimile or portable document format) is considered an original. Both parties acknowledge and accept that an electronic signature by either party shall be legally binding.

REGISTERED REPRESENTATIVE

*David Weir*

(Signature of Emerson Equity LLC Representative)

David Weir

(Typed or Printed Name of Emerson Equity LLC Representative)

Agreed and accepted as of the date hereof:
CLIENT
THIS AGREEMENT CONTAINS AN ARBITRATION CLAUSE LOCATED IN
SECTION 12 ON PAGES 3 AND 4 OF THIS AGREEMENT.

*Jackie Barth*
Jackie Barth (Sep 13, 2011)

(Signature of Client)

Jackie Barth

(Typed or Printed Name of Client)

6. **AUTHORIZATION:** Client hereby authorizes U.S. Bank National Association or alternative provider of escrow service, as the case may be (the "Escrow Agent"), to pay, from the funds in escrow in connection with any sale of the Shares, the Transaction Fee to Finder upon the closing of the Transaction.

7. **CLIENT REPRESENTATIONS:** In connection with Client's intended sale of the Shares, Client hereby represents, warrants and covenants to Finder and to the other parties to any transaction contemplated hereunder as indicated below. Client understands that, but for the truth of Client's representations below, Finder would not enter into this Agreement or provide the services contemplated hereunder to Client.

a) Client understands that the Shares are restricted, illiquid and do not trade on any national securities exchange, and Client is aware of the implications and risks associated therewith.

b) Client is aware that while Shares may be listed and/or shown for sale in various marketplaces (including without limitation website listings of illiquid investments), there may be no market for the Shares, and there is no assurance that the Shares will be sold at a profit to Client, or at any specific price, or at all.

c) Client understands that the illiquid nature of the Shares, and the fact that the Shares are not listed on any national exchange, and there is very limited information available about the Issuer, make attempts at valuation on any given time or date highly imperfect and potentially wholly inaccurate. Client is making and will make his own informed, independent determination as to the value of the Shares and the price at which Client elects to sell the Shares without reliance on any information, analysis or advice from Finder or any of Finder's affiliates, including without limitation SharesPost, Inc. and its affiliates. Client understands and agrees that Finder is acting only as a finder with respect to the sale of the shares and is not acting as a broker or in any capacity that would create any fiduciary obligations between Client and Finder.

d) Client owns valid and clear title to the Shares and with the exception of any applicable right of first refusal in favor of the Issuer, there is no provision of any agreement applicable to the Shares or Client that would bar or impede the sale of the Shares as contemplated hereunder.

8. **TERM:** Unless renewed, this Agreement terminates upon the earlier of (i) the payment of the Transaction Fee to the Finder, or (ii) the date ninety (90) days from the date hereof. Upon a termination of this Agreement pursuant to subsection (ii) immediately above, the Client's obligation to pay Finder the Transaction Fee shall survive indefinitely if the Shares are at anytime sold to any individual or entity introduced to Client by Finder.

9. **MODIFICATION:** This Agreement may not be modified except by a written

amendment signed by both Client and Finder. No waiver of this Agreement shall be construed as a continuing waiver or consent to any subsequent breach thereof.

10. **ENTIRE AGREEMENT:** This Agreement sets forth the entire agreement and understanding between the parties relating to the subject matter herein and supersedes all prior discussions between the parties, and no representation, promise, inducement or statement has been made by or on behalf of either party hereto concerning the subject matter hereof which is not set forth in this agreement. Any subsequent change or changes in the Finder's duties or Transaction Fee will not affect the validity or scope of this Agreement.

11. **GOVERNING LAW:** This Agreement will be governed by the laws of the State of California without regard to its conflicts of law provisions.

12. **ARBITRATION AGREEMENT:** THIS AGREEMENT CONTAINS AN ARBITRATION CLAUSE. BY SIGNING THIS AGREEMENT THE PARTIES AGREE AS FOLLOWS: Controversies arising between Client and Finder, its affiliates, and their respective officers, directors, employees, agents or representatives shall be determined by arbitration in accordance with the rules then in effect, of the Financial Industry Regulatory Authority ("FINRA"), and Client hereby consents to such jurisdiction. All awards rendered by the arbitrators shall be binding and final, and judgment upon the award may be entered in any court of competent jurisdiction.

a) All parties to this agreement are giving up the right to sue each other in court, including the right to a trial by jury, except as provided by the rules of the arbitration forum in which a claim is filed.

b) Arbitration awards are generally final and binding; a party's ability to have a court reverse or modify an arbitration award is very limited.

c) The ability of the parties to obtain documents, witness statements and other discovery is generally more limited in arbitration than in court proceedings.

d) The arbitrators do not have to explain the reason for their award.

e) The panel of arbitrators will typically include a minority of arbitrators who were or are affiliated with the securities industry.

f) The rules of some arbitration forums may impose time limits for bringing a claim in arbitration. In some cases, a claim that is ineligible for arbitration may be brought in court.

g) The rules of the arbitration forum in which the claim is filed, and any amendments thereto, shall be incorporated into this Agreement

h) No person shall bring a putative or certified class action to arbitration, nor seek

16. **ORIGINALS:** Once signed, any reproduction of this Agreement made by reliable means (for example, photocopy, facsimile or portable document format) is considered an original. Both parties acknowledge and accept that an electronic signature by either party shall be legally binding.

REGISTERED REPRESENTATIVE

*Daniel W*

(Signature of Emerson Equity LLC Representative)

David Weir

(Typed or Printed Name of Emerson Equity LLC Representative)

Agreed and accepted as of the date hereof:
CLIENT
THIS AGREEMENT CONTAINS AN ARBITRATION CLAUSE LOCATED IN
SECTION 12 ON PAGES 3 AND 4 OF THIS AGREEMENT.

(Signature of Client)

Linus Liang

(Typed or Printed Name of Client)

### FINDER'S AGREEMENT

This Finder's Agreement ("Agreement") is between Emerson Equity, LLC ("Finder") and the Client (as defined below).

In consideration of the mutual agreements and covenants herein contained, the parties hereto agree as follows:

1. **DEFINITIONS:** For purposes of this Agreement, the following defined terms shall have the meanings ascribed to them below:

    **Registered Representative:** A representative of the Finder.

    **Client:** The member buyer or member seller, respectively, signing this Agreement.

    **Issuer:**              Zynga Game Network Inc.

    **Share Type:**          Common

    **Number of Shares:**    20,000

    **Transaction Fee:**     3.0%

2. **AGENCY:** The Client wishes to sell or purchase, as the case may be, the Number of Shares of the Share Type of the Issuer indicated above (the "Shares"). The Client appoints the Finder as its exclusive agent to identify a purchaser or seller, as the case may be, for the purchase or sale of the Shares (a "Transaction") during the effective term of this Agreement.

3. **INDEPENDENT CONTRACTOR:** This Agreement does not establish a partnership, agency, broker relationship, employment, joint venture or similar relationship with the Client for any purpose. The Finder is and will remain an independent contractor in its relationship to the Client.

4. **DUTIES:** Finder will use commercially reasonable efforts to find a purchaser or seller, as the case may be, for Client's desired Transaction. The posting of an indication of interest on the relevant bulletin board maintained by SharesPost, Inc. at www.sharespost.com shall constitute "commercially reasonable efforts."

5. **TRANSACTION FEE:** The Client shall pay the Finder the Transaction Fee within five (5) business days of the closing of the Transaction. Client's obligation to pay the Transaction Fee to Finder shall apply to any Transaction including, without limitation, a sale to an affiliate of SharesPost, Inc. or the Issuer or its assignee(s) in connection with a right of first refusal or similar mechanism.